Andrew J. Christensen (SBN: 260748)
Law Offices of Andrew J. Christensen, P.C.
2063 Mountain Blvd. Suite 2
Oakland, CA 94611
Tel: (510) 761-7183
Fax: (510) 680-3430
Andrew@CaliforniaHomeLawyer.com

Attorneys for Debtor Melissa Wilkerson

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| In the Matter of:<br><br>Melissa Wilkerson<br>        Debtor | Bankruptcy Case:   25-40564 CN<br><br>Chapter 13<br><br>**Reply of Debtor Re Motion for Damages for Violation of the Automatic Stay**<br><br>Hearing REMOTE OR IN PERSON<br>Date: July 18, 2025<br>Time: 11:00 a.m.<br>Place: Courtroom 215<br>1300 Clay Street, Oakland CA 94612<br>The Honorable Charles Novack |
|---|---|

    Melissa Wilkerson hereby files this Reply regarding her *Motion for Damages for Violation of the Automatic Stay* against NewRez LLC dba Shellpoint Mortgage Servicing, NBS Default Services, LLC, ("NBS") and Good Neighbor Homes LLC, ("GNH") (jointly "Creditors") for proceeding with a foreclosure sale in violation of the automatic stay.

**1. <u>NBS DEFAULT SERVICE'S OPPOSITION</u>**

    NBS's Opposition to the Motion is Docket 51, with declarations in support docket 53 and 54, and a request for judicial notice, docket 52.

    This Court may grant this Motion at the initial hearing because all necessary material facts are undisputed: the foreclosure auction began on April 1, 2025, the bankrutpcy was filed on April 1, 2025, the auction could not be deemed final until 45 days later on May 16, 2025, NBS admits that it received notice of the bankruptcy at 11:57 am central time (9:57 am pacific time) within less than an hour of the case being filed, and NBS intentionally moved forward with the auction after that,

-1-

and after being told by Debtor's counsel to cancel the sale or face sanctions. NBS admits that after this notice they kept bidding open, took the wire transfer for the money from GNH, received the notice of intent to bid from Carl Dexter a few days later without telling him the sale was cancelled because of bankruptcy, took the action of moving the auction closure date to 45 days, did not tell GNH about the bankruptcy or that the auction was closed, took the action of telling GNH after the 15 days that the new 45 day time applied because of the notice of intent to bid, and then NBS accepted the high bid and deemed the sale final on the 45th day pursuant to the procedures for §2924m, and communicated to GNH that they were the winning bidder on May 19, 2025 and only needed to record the TDUS. During this time NBS's counsel repeatedly told Debtor's counsel they would not stop the sale but would proceed to accept bids, finalize the sale, and issue a Trustee's Deed Upon Sale (TDUS). These are willful violations of the stay and all facts necessary to grant this motion in Debtor's favor are undisputed.

The bankruptcy case could have been filed anytime before May 16, 2025, at 5:00 pm and the outcome in this case would be the same, because that was the earliest point when the sale could have been deemed final under §2924m and §2924h.

There is no dispute that the sale was deemed final by NBS by accepting the high bid of GNH, and that NBS "cancelled a completed sale" after this Motion for Sanctions was filed. The only dispute is the frivolous argument that the acceptance and completion of the sale was April 1. This is plainly not true because NBS admits the 45-day period applies and that NBS kept the auction open to receive more bids and then identified GNH as the high bidder and deemed the sale final on the 45th day, which is clear from all arguments and declarations in support of NBS's opposition and the emails between the NBS and GNH, attached here as **Exhibit H**. Therefore, there is no real dispute of material fact that the sale was deemed final by the act of NBS accepting the high bid of GNH on the 45th day, not on April 1. As will be show in detail below, all evidence points to the NBS deeming the sale final after the 45th day, sometime between May 16 and May 19 when NBS told GNH it's bid had been accepted as the winning bid.

NBS argues "The Property is not subject to the automatic stay as the Property was not

property of the estate at the time of the filing of the bankruptcy, since it had been sold at the foreclosure sale." This argument is frivolous because by NBS's own admission in its declarations and its opposition, it kept bidding open for 45 days after the auction opened pursuant to §2924m, precluding the sale from being deemed final by law until the 45th day at 5:00 which was after the bankruptcy case was filed. In fact, after the petition was filed a notice of intent to bid came in and NBS did not reject it or tell the prospective bidder the auction was closed. NBS admitted to Debtor's counsel Vincent Wood in emails on May 7, 2025, that the identity of the winning bidder had not been determined, obviously meaning that the auction was still ongoing for the receipt of bids after the bankruptcy was filed. The sale cannot effect a transfer of ownership from Debtor to an unknown and undetermined third party during open bidding before the acceptance of a specific bid pursuant to the statutory foreclosure procedures.

If NBS did deem the sale final by accepting GNH's bid and declare GNH the winning bidder on April 1, then NBS is admitting an express violation of §2924m making them liable for damages for violation of that law, making the sale automatically void under state law, and Debtor could amend the motion to seek damages and relief under that legal theory. However, that is obviously not what happened because NBS states many times that the 45-day period applies and they complied with it, keeping bidding open for more bids. Obviously bidding would not stay open for 45 days if the sale had been completed on April 1. NBS's word games cannot hide the fact that NBS only *received* GNH's bid on April 1, but did not *accept* it as the high bid within the meaning of §2924m and §2924h on April 1 by deeming the sale final.

NBS's counsel Michelle Mierzwa stated in an email to GNH on May 20, 2025, that "Good Neighbor Homes, LLC as the high bidder at the live sale auction was deemed the last and highest bidder pursuant to Civil Code section 2924m(c)(4)." **Exhibit H**. NBS's counsel goes on to say that the "Trustee's Deed Upon Sale will need to be recorded within 60 days of the live sale auction in order to benefit from the statutory "relation back" to 8:00 a.m. on the day of the live sale" and that "There is a concern that the borrower (Wilkerson) under the foreclosed loan intends to challenge the validity of the sale" because they were served with the Rule 2004 examination order and

subpoena, and that therefore "As a result, it may be prudent" for GNH to seek for "annulment/relief from stay regarding recording of the Trustee's Deed[.]"

This evidence conclusively establishes that NBS took the affirmative act to deem the sale final on or shortly after the 45th day by officially accepting GNH's bid as the high bid, in violation of the automatic stay. This is why NBS claims that it "cancelled" the sale, which means it cancelled a completed sale it had deemed final and notified GNH that they were the winner.

This email is also very strong evidence that the TDUS was actually issued because the language in the email plainly refers to an existing executed TDUS that only needs to be recorded, and the email cannot in any way be interpreted to mean that a TDUS had not yet been issued because NBS asks if GNH wants to agree with all parties to return the funds and cancel the completed sale rather than fight over the last remaining step of recording the existing TDUS. NBS and GNH claim in this case that no TDUS was executed or delivered, but that claim is undermined by this email. This email also demonstrates that NBS did not take any action or even consider undoing the sale until after being threatened with sanctions and being served the Rule 2004 examination order.

NBS's argument that the property was not property of the estate when the bankrutpcy case was filed is meritless because §2924m(f) expressly states that during the 45-day auction period for receiving bids, ownership stays with the borrower.

NBS states that "Debtor does not dispute that the Property sold at 9:14 a.m. on April 1, 2025." This is patently false and frivolous and vexatious contrary to the entire Motion for Damages.

NBS argues that Debtor has not rebutted the presumption that the bankruptcy case was filed at the time of the electronic time stamp on the notice of 9:19 am. This argument is meritless because two undisputed declarations clearly establish the time of filing as 9:06 am and NBS does not object to any of Debtor's evidence in the declarations or point to any other evidence that would contradict her claims about the time of filing the petition being 9:06 am.

NBS falsely states "Debtor has provided no such evidence in this case to rebut the presumption that the Petition she allegedly presented at 9:06 a.m. was in acceptable form for filing." This is incorrect because the documents were filed and are on the docket as filed in her handwriting.

The time of filing the petition is fact for this Court to decide based on the evidence before the Court. There is no conflicting evidence, only the two declarations that it was filed at 9:06. It is undisputed that the petition was filed pro se after being handwritten, and no dispute that it was personally handed to the clerk. NBS submits no evidence that the moment this occurred was 9:19 as marked on the notice of bankruptcy case filing where the clerk had to review the documents and type the information into the system manually in order to officially log the case into the ECF system which then generated the notice of bankruptcy case filing at 9:19 am. Obviously this process takes some number of minutes and is not instantaneous when the clerk receives in her hands the handwritten petition. Therefore, it is undisputable that the bankruptcy petition was not filed within the meaning of binding Ninth Circuit law at 9:19 am because it is not possible on these facts. Therefore, the only question is how many minutes before 9:19 am was the petition handed to the clerk, and the only evidence before this Court are the declarations of Debtor and her grandfather that she handed the petition to the clerk at 9:06 am. NBS does not object to the evidence or contradict it. Therefore, this Court can simply find on the uncontested evidence that the petition was filed at 9:06 am.

However, the time of the filing of the petition should not matter in this case and the Court need not decide if the case was filed at 9:06 or 9:19 am because the result is the same because both were before the auction was completed because NBS admits many times that it kept the auction open for 45 days for more bids and determined that GNH was the high bidder on the 45th day, thereafter accepting the bid and deeming the sale final, then notifying GNH that they are the high bidders and asking GNH if they wanted to rescind the completed sale. Obviously the sale could not have been completed on April 1 if NBS kept bidding open for 45 days.

NBS argues "Debtor's interpretation of California Civil Code 2924m applies to when a sale is deemed final to perfect transfer of title, not when the sale is completed, and the automatic stay does not prohibit post-sale actions to perfect title." This is a misrepresentation of Debtor's arguments. Section 2924m plainly states when the sale can be "deemed final" and on the undisputed facts of this case that was not until the 45th day, which was May 16, 2025, long post-petition.

Case: 25-40564   Doc# 55   Filed: 07/05/25   Entered: 07/05/25 01:48:58   Page 5 of 18

Perfection is not the issue here, but the completion of the sale.

NBS's statements and descriptions of the holdings in *Hager* are incorrect and misleading. *Hager* found the sale was void for violating the stay because the bankruptcy was filed before the sale was deemed final on the 45th day. NBS would have this Court think it was decided based solely on the perfection issue under an older version of the statue. That is not accurate.

NBS argues that it did not issue or record a TDUS and therefore did not violate the stay. That fact is in dispute, as there is evidence suggesting that a TDUS was issued. However, issuing the TDUS is not the only violation of the stay, and NBS is still liable for keeping the auction open, accepting the wire transfer of funds from GNH, and accepting GNH's bid as the high winning bid on the 45th day deeming the sale final at that time and communicating that to GNH.

NBS argues "Debtor does not provide any evidence that NBS took any affirmative acts." This is incorrect. NBS took the affirmative acts of keeping the sale auction open for 45 days pursuant to §2924m as evidenced by the emails of NBS counsel Michelle Mierzwa attached to the motion, which fact is undisputed and openly admitted by NBS. NBS refused to stop the auction, sent emails saying it would not stop the auction, accepted the notice of intent to bid without tell the person the acution was closed because of the bankruaptcy case, and told Debtor's counsel they would issue the TDUS on the 45th day after bidding closed. NBS took the wire transfer of money from GNH. These are all acts. **Exhibit E** attached to the Motion is an email from NBS counsel Michelle Mierzwa to Debtor's counsel Vincent Wood wherein she admits that the high bidder has not yet been identified because the 45 day period is not over and there is still time for bids to come in: "As a result of the delivery of a notice of intent to bid affidavit pursuant to Civil Code section 2924m(c)(2), the 45-day period for post-sale bids was triggered, so the identity of the high bidder is not yet known. The identity of the high bidder will be determined at or after 5:00 pm on the 45th day following April 1, which is May 16, 2025. The high bidder will either be Good Neighbor Homes LLC (the high bidder at the live auction on April 1, 2025) or Carl Dexter (the post-auction eligible bidder if he submits a bid in excess of the high bid by Good Neighbor Homes LLC on or before 5:00 pm on May 16, 2025). Pursuant to Civil Code section 2924m(c)(4) and Civil Code section 2924h(c), NBS Default

-6-

Case: 25-40564    Doc# 55    Filed: 07/05/25    Entered: 07/05/25 01:48:58    Page 6 of 18

Services LLC will issue the trustee's deed regarding the April 1, 2025 foreclosure sale once the identity of the high bidder has been determined as dictated by statute."

This proves that NBS had not "accepted" GNH's bid as the winning bid and deemed the sale final pursuant to the requirements of §2924h, so at least as of the date of that email on May 7, 2025, NBS had not deemed the sale final, but kept it open for bidding. This logically means that NBS did not deem the sale final until on or after the 45th day, and there can be no doubt but that identifying and accepting the high bid as the winning bid and contacting the winning bidder are all acts. They do not happen automatically. There is no other possible conclusion. NBS does not argue that it did not accept a high bid or deem the sale final. There is no dispute that NBS did deem the sale final under §2924h. The only question of fact is when that occurred, whether on April 1 as NBS tries to argue, or on or after the 45th day May 16, 2025, which is the only date supported by the evidence here.

NBS stated in interrogatory responses that "On May 19, 2025, NBS confirmed no other bid funds had been received and that the high bidder at auction, Good Neighbor Home, LLC, was still the high bidder." **Exhibit I**. This is evidence showing that NBS took the act of reviewing the file, selecting the winning bidder, accepting that bid, deeming the sale final under §2924h, and then contacting GNH to tell them they won, which Michelle Mierzwa did on May 19, 2025, by leaving a voicemail with NBS stating that "you were the successful bidder[.]" Attached as **Exhibit J** is an email chain produced by GNH in discovery that has the transcript of this voicemail. These are exactly the acts the foreclosure trustee must do to deem the sale final under §2924h and they are no different than dropping the hammer at the live auction before §2924m and announcing the winning bidder.

NBS also admitted in response to Debtor's Interrogatory 2 that "NBS inquired with the high bidder Good Neighbor Homes, LLC, regarding whether it might agree to voluntarily *cancel the completed sale*. On May 21, 2025 Good Neighbor Homes indicated that it would agree to accept a refund of its bid funds to cancel the foreclosure sale, so NBS inquired with Shellpoint about a voluntary agreement *to cancel the completed sale*." (emphasis added). **Exhibit I**. NBS and GNH

-7-

both showed evidence and argued that NBS returned the money to GNH. This evidence shows that NBS deemed the sale final by accepting GNH's bid as the winning bid on or after the 45th day deeming the sale final pursuant to §2924m and §2924h. There is no other point in time that NBS could have determined the high bid was GNH when NBS admits it waited the full 45 days for other bids to come in. Obviously if other bids had come in during that time that were higher, NBS would have had to choose which was the highest on the 45th day and accept that bid and deem the sale final.

A. *In re Stephens* Is Erroneous and Should Not be Followed

NBS argues that this Court should follow the case of *In re Stephens* 661 B.R. 948 (Bankr. C.D. Cal. 2024) where a bankruptcy court in the Central District addressed the §2924m issue in 2024 and ruled (incorrectly) that the automatic stay did not apply to the post-petition finalization of a foreclosure sale where the bankruptcy was filed on the 43rd day, two days before the sale was deemed final on the 45th day. In *Stephens*, the high bid offer at the initial auction on April 4, 2024, was from a third part and timely notices of intent to bid were received and caused the 45-day period to apply, and an eligible bidder submitted a bid offer on May 16, 2024, the bankruptcy was filed the next day on May 17, and the sale was deemed final post-petition on May 19, 2024, by the trustee accepting the high bid that was placed on May 16.

The *Stephens* court ruled that the finalization of the sale by deeming the sale final, accepting the high bid, and issuing and recording a TDUS did not violate the stay because there was no affirmative "act" to finalize the sale, only the operation of law. This is erroneous because "California law provides that the purchaser at a nonjudicial foreclosure sale takes title by a trustee's deed, not by operation of law." *In re Gonzalez*, 456 B.R. 429, 434 (Bankr. C.D. Cal. 2011). [citing *Moeller v. Lien*, 25 Cal. App. 4th 822, 831 (1994) "The purchaser at a foreclosure sale takes title by a trustee's deed."]. California Civil Code §1091 provides that real estate can only be transferred by deed or operation of law. Transfer by deed requires execution, delivery, and acceptance, including in foreclosure sales. Transfer of title by operation of law includes such things as title passing a bankruptcy estate upon filing a petition, or the merger of corporations. *Gonzales*, at 435. In fact,

the bankrutpcy court in *Gonzales* in 2011 explained that the "deemed final" language in §2924h upon acceptance of a high bid only creates essentially a contract for sale of the property, and ownership does not transfer until the TDUS is executed and delivered: "Consequently, the "deemed final" provision of section 2924h does not alter the rule of section 1091 of the California Civil Code that ownership of, and title to, real estate passes by deed. At the time the petition was filed on February 22, 2011 — even presuming Quality Loan Service's sale was final — Gonzalez still held the title to the Property (and was in possession thereof). Quality Loan Service's execution of the Deed on February 25, 2011 violated the automatic stay, and the Deed is therefore void. *In re Schwartz*, 954 F.2d at 571." *In re Gonzalez*, 456 B.R. 429, 438 (Bankr. C.D. Cal. 2011). *Gonzales* was before §2924m had been enacted, but §2924h still similarly said that the auction is "deemed final" upon acceptance of the last highest bid, and the bankruptcy was filed the same day as the auction and only a few minutes after the auctioneer had accepted the highest bid and dropped the gavel announcing the winner. The TDUS was issued and recorded post-petition and the *Gonzales* court found that these acts violated the stay and were void because deeming the sale final by accepting the high bid essentially formed a contract for the sale, but the sale does not complete and ownership does not transfer until the TDUS is issued, conveyed, and accepted.

Other bankruptcy courts have held the opposite, finding that filing a bankruptcy after the auction but before the TDUS means the sale is final, equitable title passes, and the issuance of the TDUS and recording are for perfection only. The Ninth Circuit BAP *In re Bebensee-Wong* ruled that recording a TDUS post-petition did not violate the stay where the sale occurred 12 days pre-petition because of the exception in 11 U.S.C. §362(b)(3) for perfection. *In re Bebensee-Wong v. Fannie Mae (In re Bebensee-Wong)*, 248 B.R. 820 (B.A.P. 9th Cir. 2000). Conspicuously absent in that case was any mention of when the TDUS was issued, delivered, or accepted, making it of questionable value because the holding would only be valid if the TDUS was executed, delivered, and accepted before the bankruptcy was filed.

In the case of *In re Garner*, judge Leslie Tchaikovsky in 1997 granted relief from stay and held that §2924h(c) provided the sale is final upon acceptance of the high bid leaving debtor with

Case: 25-40564    Doc# 55    Filed: 07/05/25    Entered: 07/05/25 01:48:58    Page 9 of 18

only "bare legal title" when he filed bankruptcy the day after the auction even though the TDUS was issued, delivered, accepted, and recorded post-petition. Judge Tchaikovsky held "An argument may be made that section 2924h(c) is only effective if the foreclosure sale deed has been issued before the bankruptcy petition is filed. The *Engles* court recognized that, arguably, issuance of a foreclosure deed did not violate the automatic stay. However, it concludes that the better view is that it would constitute a violation. […] The Court agrees that the answer to this question is not perfectly clear. However, the Court concludes that the better view is that issuance of the deed does not violate the automatic stay. As discussed above, the foreclosure sale is final once the highest and last bid is accepted." *In re Garner*, 208 B.R. 698, 701 (Bankr. N.D. Cal. 1997). Therefore, the holdings in *Garner* and similar cases conflicts with the holding of *Gonzales* about this issue of whether ownership passes upon acceptance of the high bid, or upon issuance of the TDUS. However, they all agree that the sale is deemed final upon acceptance of the high bid under §2924h.

Here, this Court need not resolve the conflict in these two lines of cases about whether ownership to the property passed at the acceptance of the high bid by NBS on the 45th day, or never passed because no TDUS was issued, because this is not dispositive because the bankruptcy case here was filed before the sale was deemed final and before a deed was issued so the sale is void in any event.

The *Stephens* holding that there is no "act" in deeming the sale final is erroneous because the foreclosure trustee acts by identifying the high bidder, accepting the high bid at the end of the auction, notifying the winning bidder, preparing the TDUS and issuing it to the winner. No sale can occur without these acts. Bids are defined in §2924h(a) as "offers" and are not accepted by operation of law in a vacuum, but are received when submitted, but only one high bid is accepted by the trustee at the point the sale can be deemed final after bidding closes.

Section 2924m(c) states "a trustee's sale […] **_shall not be deemed final until_** the earliest of the following:" (emphasis added) and then specifies that "as of 5 p.m. on the 45th day after the trustee's sale [..] the eligible bidder that submitted the highest bid shall be deemed the last and highest bidder pursuant to the power of sale. The trustee shall return any losing bid to the eligible

bidder that submitted it." §2924m(c)(4)(B). This statute contemplates that the trustee shall deem the sale final by accepting the high bid on the 45th day at 5pm. That is when the auction closes. Only the trustee can accept a bid. Offers can only be accepted by an affirmative act of acceptance by the trustee. This is not materially different from the trustee identifying and accepting the high bid at the courthouse steps after pausing for a few seconds to determine that no more bids are coming in and then closes the auction by accepting the high bid and dropping the gavel.

It has long been that the acceptance of the high bid is the point in time the sale is deemed final under §2924h(c) which states "the trustee's sale shall be deemed final upon the acceptance of the last and highest bid[.]" Section 2924h(b)(3) states that the trustee shall have the right to require "last and highest bidder to deposit [the high bid amount] immediately prior to the completion of the sale" and that "the completion of the sale being so announced by the fall of the hammer or in another customary manner." In other words, once the last bid is submitted, the trustee confirms that the money is deposited "immediately prior to the completion of the sale" then the trustee accepts the bid and announces it. This same procedure still applies to the bids and acceptance and announcement, which are all affirmative acts. The acceptance is an act different from the announcement.

The only difference between the acceptance of the high bid by the trustee at the auction under the old rules was that the bidding closed when no more bids came in and there was an immediate oral communication by the trustee to the high bidder that the trustee accepted the high bid and "announced by the fall of the hammer[.]" §2924h(b)(3). Now, the same thing happens in an office instead and there is still an act of acceptance by the trustee and communication to the winning bidder that the bid is accepted. That does not make the acceptance of the high bid any less of an "act" for purposes of violating the stay. Here, NBS notified GNH on May 19, 2025, by leaving a voicemail that it had accepted GNH's high bid and that GNH was therefore the winning bidder. This is an act under the statute that violated the stay.

The *Stephens* court erroneously ruled that the act of executing and delivering a TDUS did not violate the stay because "Debtor's temporary legal title had expired by its own terms, so the

-11-

estate no longer had any "property' interest and §362(a)(3) did not apply." *Id* at 661. This ruling is erroneous because §2924m(f) clearly and unequivocally states that the mortgagor retains title to the property during the auction period and says nothing about this being "temporary." This holding in *Stephens* conflicts with controlling California law on this matter as explained above. Section 2924m(l) further clarifies that the opening of the auction does not terminate the mortgagor's homeowner's insurance: "The pendency of a determination of finality under subdivision (c) shall not cause termination of any hazard insurance coverage in effect at the time of the trustee's sale." This is because the mortgagor maintains all legal and equitable title to the property and his insurance still protects his equitable interests during the 45 days.

        This subdivision (f) clarifying title ownership would be superfluous and unnecessary if it only referred to bare legal title. The only reason for (f) is to make clear that full ownership remains during the 15 or 45 days because that period is long enough that there could be a risk of dispute over liability for the property during the 45 days, or over who has the right to sell or encumber the property at that time.

        There is nothing in the statute to suggest that during the auction period the mortgagor only holds "temporary title" as *Stephens* concludes, because the statute plainly contemplates that any insured loss is born by the mortgagor and his property insurance, and there could be no argument that the loss should be borne by any party that submitted an unaccepted bid offer before the auction became final.

        *Stephens'* holding that as of the "conclusion of the live auction" debtors "loss of title to the Property was already locked in place, leaving him with merely temporary title" is erroneous because there is nothing in the statute to suggest any of debtor's rights are adversely affected by the opening of bidding or the submission of unaccepted bids or the end of the in-person auction. Section 2924h(a) states that bids "shall be deemed to be an irrevocable offer by that bidder to purchase the property" and that any subsequent bid "shall be a cancellation of the prior bid." A bid is on offer that gives no enforceable equitable interests or rights until it is accepted as the winning bid, just as under any contract or any sale of property.

Furthermore, the holding in *Stephens* effectively says that the point in time that debtor loses his rights is at the "conclusion of the live auction" which is expressly against the statutory language because under §2924m the only time the sale is deemed final at the conclusion of the live auction is if the high bidder is a Prospective Owner-Occupant, which was not the case in *Stephens* or here. §2924m(c)(1).

*Stephens* is wrong because equitable title or ownership can only pass between the mortgagor and the winning bidder after the sale closes. There is no point in time when a mortgagor loses equitable title by the opening of an auction because ownership has not passed to any other party. The receiving of a bid at an auction is not the same as accepting the high bid. A high bid is received at the time it is submitted, but it is not accepted until the trustee takes that action and announces the acceptance of the offer. This Court should not follow the erroneous logic of *Stephens* that incorrectly interprets the statutes and incorrectly focuses on perfection and relation back rather than the actual completion of the sale.

B. <u>Damages</u>

NBS argues "First, Debtor does not identify any specific damages as a result of the foreclosure sale being held within the same hour that the bankruptcy petition was filed." This is not true because the Motion specifically identifies the attorney's fees caused by the violation of the stay and the refusal to stop the sale. Attorney's fees are specifically identified as damages in §362.

Debtor went to great lengths to avoid filing this Motion and to warn Responding Party Creditors by sending letters and emails, and NBS refused to stop the sale auction and proceeded forward. Debtor gave NBS over seven weeks to stop the sale and honor the automatic stay, but NBS did not, and proceeded forward with the auction, leaving Debtor no choice but to file the Motion. It was only upon filing this Motion that NBS or Shellpoint took action to actually cancel the sale that they deemed final on May 16.

The facts show plainly that NBS on behalf of itself and Shellpoint its principal, chose to gamble by not cancelling the sale to see if Debtor got serious and filed a motion, and once they learned the motion had been filed they only then backed out and canceled the sale. All

communications from NBS and Shellpoint to Debtor before the motion was filed consistently stated they would not stop the sale but would complete the sale and issue the TDUS. This Motion was filed on May 22, 2025, and it was not until May 28, 2025, when NBS Counsel Michelle Mierzwa called Debtor's counsel Andrew J. Christensen that there was any indication that they would consider cancelling the sale. In fact, Michelle Mierzwa told Andrew Christensen on the phone on May 28, 2025 that she demanded Debtor withdraw the Motion because there was no violation, and that if Debtor immediately withdrew the Motion that NBS "might consider" cancelling the completed foreclosure sale. So in reality, NBS and Shellpoint doubled down on their violation all the way until after the motion was filed and after their counsel was unsuccessful at demanding withdrawal of the Motion. This abuse warrants punitive damages because NBS and Shellpoint have demonstrated flagrant disregard of the automatic stay, only making attempts to cancel their void foreclosure sale after getting caught.

### 2. **OPPOSITION OF GOOD NEIGHBOR HOMES**

GNH filed an opposition, docket 47. GNH argues that it did not violate the stay because no TDUS was issued, received, or recorded. This is a dispute of fact because there are emails produced that refer repeatedly to a TDUS and the recording of it that strongly suggest that a TDUS was issued. **Exhibit H**. The emails between NBS and GNH discuss at length cancelling of a completed foreclosure sale with the only remaining item being to record the TDUS. This is not conclusive, but strongly suggests a TDUS was issued, and possibly received. An existing TDUS would explain the existence and content of the emails going back and forth of NBS getting the consent of Shellpoint and GNH both to consent to cancel a completed sale. The emails produced in discovery show NBS Counsel Ms. Mierzwa discussing the threat of Debtor challenging the sale and discussing the risks and options of the parties and asking to discuss the matter with GNH legal counsel. This suggests that there could be further communications colluding to violate the stay together or to hide evidence of the stay violation. Further discovery is needed on this issue.

-14-

### 3. SHELLPOINT DID NOT TIMELY FILE OPPOSITION

Shellpoint did not timely file an opposition to this Motion before this Reply was filed. Opposition was due by July 4, 2025. However, attorney Dane Exnowski contacted Debtor's counsel on June 5, 2025, about the Motion. Shellpoint is aware of the Motion.

The evidence NBS produced in discovery and submitted in opposition show that NBS asked Shellpoint to cancel the foreclosure sale at some point, but Shellpoint did not agree to it until May 30, 2025, long after the Motion was filed.

Shellpoint is liable for the acts of its agent NBS. "Since the trustee acts as an agent for the beneficiary, there can be no question that liability for damages may be imposed against the beneficiary where, as here, the trustee in exercising the power of sale is acting as the agent of the beneficiary. *Munger v. Moore*, 11 Cal. App. 3d 1, 8 (1970).

### CONCLUSION

The main facts necessary to rule on this motion are uncontested, which is that the bankruptcy was filed on April 1, 2025, the day the auction began, that NBS received notice of it at 9:57 am, that the sale could not be deemed final under §2924m until 45 days later, that NBS did not deem the sale final before the 45th day, that NBS's legal counsel expressly refused to stop the ongoing foreclosure auction in writing several times with full knowledge of the automatic stay and §2924m, and that NBS did not take action to cancel the sale until more than a week after the Motion was filed and several days after they received service of the Motion. It is clear from this timeline that NBS chose to violate the stay and wait to see if Debtor filed a motion for sanctions.

NBS admits that it kept the auction open to receive bids for 45 days after it had actual knowledge of the bankruptcy case, which is undeniably a violation of the stay because it is the "continuation" of a proceeding against the debtor and to "recover a claim against the debtor" and an "act to obtain possession of property of the estate" and an act to "enforce a lien against property of the estate" and to "enforce against property of the debtor any lien." 11 U.S.C. §362.

Debtor requests the Court grant the relief requested in the Motion at the first hearing, award attorneys' fees and decide on an appropriate measure of punitive damages. Punitive damages should

-15-

be at least a single or double multiplier of the actual damages of the attorney's fees in this case because plainly the prospect of $17,977.50 in fees requested in the original Motion was not enough to deter intentional misconduct.

Debtor has incurred $10,395 in additional fees since the Motion for Damages was filed. **Exhibit K**. Debtor requests that the Court award a total of $26,422.50 in attorney's fees, which includes the $17,977.50 requested in the Motion, minus three of the hours estimated for reading the opposition and drafting a reply, and plus the $10,395 actually incurred.

Date: July 5, 2025

/s/ Andrew J. Christensen
Andrew J. Christensen
Attorney for Melissa Wilkerson

Andrew J. Christensen (SBN: 260748)
Law Offices of Andrew J. Christensen, P.C.
2063 Mountain Blvd. Suite 2
Oakland, CA 94611
Tel: (510) 761-7183
Fax: (510) 680-3430
Andrew@CaliforniaHomeLawyer.com

Attorneys for Debtor Melissa Wilkerson

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

| In the Matter of: | Bankruptcy Case: 25-40564 CN |
|---|---|
| Melissa Wilkerson | Chapter 13 |
| Debtor | **Declaration of Andrew J. Christensen in Support of Motion for Damages for Violation of the Automatic Stay**<br><br>Hearing REMOTE OR IN PERSON<br>Date: July 18, 2025<br>Time: 11:00 a.m.<br>Place: Courtroom 215<br>1300 Clay Street, Oakland CA 94612<br>The Honorable Charles Novack |

I, Andrew J. Christensen, am counsel for Melissa Wilkerson. The statements made herein are based upon my personal knowledge except to those matters which are herein alleged on information and belief, and as to those matters, I believe them to be true. If called as a witness in this matter, I could and would testify competently to each and all of the statements made herein.

1. **Exhibit H and J** are true and correct copies of an email that I received from Good Neighbor Homes in response to discovery requests I served.

2. **Exhibit I** is a true and correct copy of the interrogatory responses I received from NBS Default Services.

3. **Exhibit K** is a true and correct copy of my billing records for time incurred after the Motion was filed. I billed $10,395 in time for myself and my paralegal, in calls with opposing counsel regarding settlement, in dealing with discovery, and drafting the reply. I spent 10.6 hours

-1-

on this matter on July 4, 2025, but reduced the time billed to 7 hours in the exercise of billing judgment.

4. NBS Counsel Michelle Mierzwa called me on May 28, 2025, and demanded I withdraw the Motion because there was no violation, and that if I immediately withdrew the Motion that NBS "might consider" cancelling the completed foreclosure sale. This was the first communication from them suggesting they might do anything other than proceed forward with the sale.

5. After the Motion was filed I had calls with counsel for NBS, and calls with counsel for Good Neighbor Homes, and a call with counsel for Shellpoint, and it became clear that they each disputed the facts and law and had varying explanations, and that therefore discovery would be necessary to determine if there was any evidence to support their claims and defenses, so I drafted and served discovery.

I swear under the penalty of perjury that this is true and correct, and that this declaration was executed on the following date in Oakland California.

DATED: July 5, 2025

/s/ Andrew J. Christensen
Andrew J. Christensen
Counsel for Debtor

-2-